Leibovitch v. Islamic Republic. Mr. Tolchin? Yes, Your Honor. Good morning, Your Honor. May it please the Court, Robert Tolchin for the appellants. We have before us, Your Honor, a decision that at best I think could be described as muddled. It has a lot of errors in it, like confusing the Anti-Terrorism Act with the Foreign Sovereign Immunities Act. But the most serious thing that it did, and if I have the chance to talk about only one thing here today, this is it. The Court below ignored the nationwide service of process of federal subpoenas. That was not always the rule. That was something that came into being with the, I believe it was 2013. If not, it was 2014 amendments. And there is a procedure in Rule 45 for serving subpoenas nationwide. If responding to the subpoena or challenging the subpoena in the jurisdiction where the Court is sitting is difficult, there is a mechanism for the subpoena recipient. What do you think that has to do with Rule 4K? Well, it has nothing to do with Rule 4K because Rule 4K... But the district court's decision rested on Rule 4K. Well, that was another mistake, Your Honor. Rule 4K is called summons. Rule 45 is called subpoena. We served a subpoena, not a summons. The jurisdiction of the Court for serving subpoenas... Do you think that Rule 45 superseded our decision in GE bets? I think that Rule 45, as created by the most recent amendment that created nationwide service of process, superseded... No, that's not the question I'm asking. Okay. You seem to think that the power to serve a subpoena is the same as the power for a court to get personal jurisdiction over someone. No, I didn't say that. This case is about personal jurisdiction over the banks. For serving a subpoena... If there is no personal jurisdiction over them, they can't be forced to respond. So I don't see why the ability to send them a document is the same as the creation of personal jurisdiction. When you say, Your Honor, that that's what the case is about, we have to dissect it a little more gingerly because there were two things that were served here. There was a federal Rule 45 subpoena and there was an Illinois state law citation, which becomes a federal mechanism via Rule 69. The analysis isn't necessarily the same for both. Right now I'm talking about the federal subpoena, which seeks production of information. A federal subpoena does not restrain assets, does not require assets to be turned over. Counsel, we held in GE vets that in order to initiate a collection proceeding against any particular party, there has to be personal jurisdiction over that party. And I'm trying to figure out why there's personal jurisdiction, because as far as I know, Rule 45 is not a means to create personal jurisdiction. Nor, Your Honor, is Rule 45 a collection proceeding. Rule 45 is a mechanism to allow the judgment creditor or any plaintiff or any litigant to obtain information. If I get production of documents from the bank in response to the subpoena, it doesn't mean I get the money. In fact, all I might find out is that there's an Iranian bank account in England, and then I'll have to go to England to commence procedures, as Your Honor, Judge Easterbrook pointed out. I would not then be able to sue an entity in England here. I would have to go there. But the subpoena is for the purpose of gathering information. What Your Honor is talking about is a supplemental proceeding to enforce the judgment, what we would call a turnover proceeding or a citation proceeding, which the object is give me the money, not tell me if you have money somewhere. They're two different things. So I don't think that we have to talk about, I don't think it's even relevant, whether Rule 45 supersedes the GE decision because we're talking about different things. If the subpoena, let me say it differently, it is possible that the analysis on the citation would be in accordance with the GE decision, but the subpoena looking for information is simply an information-gathering mechanism and does not require an independent basis of personal jurisdiction as a turnover case. As a judgment creditor, the plaintiff has the right to serve a subpoena on somebody located in this jurisdiction and ask for information, whether it be documents or a deposition. So you think that if the courts of Botswana had Rule 45, you could demand that all this information be turned over in Botswana? If we had a judgment in Botswana? It wouldn't matter where you had the judgment on your current argument. All you're asking is information, and if there is an equivalent of Rule 45 anywhere in the world, any litigant must be prepared to offer that information anywhere in the world. Well, we would have to add to your scenario, you know, for example, that I wish you would answer the question as I asked it. Don't tell me I asked the wrong question. No, but Your Honor hasn't told me. Answer the question I asked. If the subpoena recipient in Botswana is an American bank that has a branch in Botswana, then yes. It doesn't matter whether it's American. On your view? Answer the question I asked. If a subpoena recipient in Botswana receives a Rule 45 subpoena under the Botswanian Rule 45, then yes, that entity has to produce whatever information it has. So we deal with this every day. In ordinary civil litigation, I can serve a subpoena. I go downstairs to the northern district, and I have a case there, and I serve a subpoena on, you know, Bank of New York, which may be located in New York. But if I serve, I can serve the subpoena out of this court, and I don't have to prove that my litigation, which might be, you know, a bus accident. It might be anything. It might be a what? It might be a bus accident. It might be a medical malpractice case. It might be any kind of a commercial, it might be any kind of case at all pending here. But if I believe that the Bank of New York in New York has some relevant information, I can serve a subpoena on Bank of New York pursuant to Rule 45. It sounds very strange. It means you can serve a subpoena on anybody, any company, and say, do you happen to know anything about X, Y, or Z? I mean, you'd completely drown companies by saying, oh, we want information about Japan, you know. No, just some contact with a bank in Japan. We think they may have Islamic, you know. Judge, obviously Rule 11 requires that before you serve a subpoena on a company, you have to have some good faith reason to believe that that company will have such information. No, I don't think that's enough. I don't think that's enough. You can't force companies to spend a lot of time and money providing you with information if you have direct access to the information you're looking for. How do I have direct access? Well, you know about these foreign banks and so on, don't you, that you think have these Islamic assets? We know that these foreign banks either pleaded guilty or accepted. Yeah, so why don't you ask the foreign or go after the foreign banks? Why are you pestering the American banks? We're pestering the foreign banks themselves via their U.S. offices. Bank of Tokyo laundered billions of dollars for Iran. They scrubbed Iran-related information off the wire transfers. They used the American system of wire transfers. So why don't you go to Tokyo? Why don't I go to Tokyo? Well, that's what they suggest. I should take my judgment, spend God only knows how much money for my clients who are victims of terrorist attacks. My clients are not the Bank of Tokyo. My clients are a family whose child was murdered at random by a terrorist. They're not made of money. To go to Tokyo, they say now, in Tokyo I have to... In Tokyo I have to... The American branch has nothing to do with it. It doesn't matter if the American branch has anything to do... I don't understand. I mean... Judge Posner, is it now... Does it even matter to you that there's a Tokyo branch connected with this American branch? Or you think you can ask anybody for anything that might be helpful to you? I think that if you are present in the jurisdiction, I am entitled to serve a subpoena and ask for information that you have. And if you are a company that touts itself by saying, you know, come bring us your business. We have a worldwide presence. We'll leverage that. We can do business. The sun never sets on us. We can do business all over the world. Except when somebody serves a subpoena and says, hey, you guys laundered billions of dollars for Iran. Iran killed our child. We want to know what you know about Iranian assets. Then they say, oh, we can't possibly search another branch. But if you search the branch, why don't you ask the headquarters? If we had a judgment where the headquarters was, we might. But we have a judgment here under an American law. There's an international convention on the recognition of judgments. Right. Which the Hague Convention is not something that Japan is part of. It is an extremely arduous process that almost always results in nothing. They want me to take my judgment, go to Japan, domesticate it in Japan as a Japanese judgment, if the Japanese court will recognize it. And I am aware of absolutely zero instances where a Japanese court has recognized a judgment issued by the United States under the Foreign Sovereign Immunities Act. And we have to remember that the Foreign Sovereign Immunities Act state-sponsored terrorism exception is controversial around the world. And why do you expect them to provide the information you want to their Chicago branch? Because they do business here. But you say they don't cooperate. They have taken the benefits of doing it. But they say you don't cooperate. Who said? You say they don't cooperate, the Japanese. That's correct. So what good is it going to do you? Well, I think if they have the subpoena enforcement power of the United States District Court and we ask for a deposition of a 30B6 witness who knows about Iranian assets, and if he comes in and he's not informed, the court has remedies. Didn't the local banks say they don't have any of those assets? They say in their local branch they don't have assets. And you know what? I believe that, that they don't have assets in their local branch. But at least you got, we'll call it cooperation from them. I have a global question, which I maybe shouldn't even ask this. But a few months ago, by airplane, et cetera, we sent billions of dollars to Iran. Yes. Did you ever try to get a hold of any of that? Oh, Judge, that is something that we looked into tremendously. All right. Well, that's all I need to know. But what you'll note is that the way that transaction, if you can glorify it with the word transaction, was set up. I'm not condoning it. I just wondered. That's where the money went, a whole lot of it. I understand. But that was deliberately set up so that the money was being transferred from someplace offshore. It didn't come from the United States. They sent it, I think, from Switzerland. Another currency. In foreign currencies. So this Bank of Tokyo, this BNP Paribas. How much money are you seeking? We're seeking to enforce our judgment. How much? 62 million. Something like that. Two million? No, 62 million altogether. 62 million? Yes. What's that for? The death of my client. Pardon? It was a foreign sovereign immunity terrorist victim judgment. One person was killed, and the survivors in the family each got awards. There was also a punitive damages amount. It's a default judgment. Right. The number that you're referring to is the compensatory awards. And that was already before this court as to which people were entitled to recover. There was an issue of whether non-citizen family members of decedents could recover. I can't get away from this point. The Bank of Tokyo, BNP Paribas, while they say that we are overseas and it's not fair to call us into court here, that did not stop them from carrying out these wire transfers shamelessly. All this cry of burden from them, it's crocodile tears. They shamelessly came into America. But when it suited their purposes, they knew how to send wire transfers, use our Fedwire system, use the SWIFT system, transfer billions of dollars with the identifying information deliberately scrubbed off of it. And now when we ask for that, they're able to come here, make use of our infrastructure. But when we ask for something reciprocal, such as, okay, now that you got caught, now that you paid billions of dollars in fines, now that you pleaded guilty, tell us what you know about the assets of Iran. And then they say, oh, we're overseas. We couldn't possibly tell an American court any of this. And it's not fair to bring us into court. And we only have to tell you essentially the non-information, what's in our Chicago branch, which is deliberate. Sure, they're happy to answer that question. But before they agree to answer that question, they know that the answer is useless. The useful information is hidden someplace else in their operation, which spans many countries. I don't know that the information is in Japan. It could be that if we went to Japan, Judge Posner, they would tell us, oh, that information is not in Japan. It might be in Botswana. Try our Botswana branch. So my clients who are victims might, if we follow their approach, we could be in litigation in 45 countries where these banks have branches looking for assets which move and won't be there by the time we find out about them. So what good will it do? I don't understand. Well, that's the question. What good is the Foreign Sovereign Immunities Act? Congress enacted it to give victims a remedy. I don't see how you expect to get any money if your notion is that as soon as you go after this, the Japanese head office will just put the money in some other place. Like Botswana, where it would be difficult. You'd have a lot of trouble getting money out of Botswana. We can play that out. They'd say, well, Botswana, now we have a billion. We've never had that before. We're not getting that. We can play that out because if I know, if they would have answered the subpoena. No, I don't understand you. Your notion is Bank of Japan will move this money around all over the world. You'll never catch up with them. But I don't think I have to because if they move the money around in order to avoid a creditor, then I may be able to commence a separate kind of claim under a fraudulent conveyance theory. I don't know where it will play out, but right now we're just trying to find out the information. If I find out they had the account. Imagine this. Imagine they say we had an account. It was at our London branch, but when you guys served us the citation, our lawyers told us the citation wasn't valid, so we moved the money to another bank. Let's say they tell us that. Well then, we might have a claim there. We might have a claim for a fraudulent conveyance. We might have a claim against that other bank. One way or another, we will be further along on the trail of trying to get these assets. Where'd they put all that money we gave them? In their pockets. It came in cash on an airplane. If the Rule 45 analysis, what the court below did was essentially apply Daimler to Rule 45 subpoenas, and that is extremely flawed. It can't possibly be what the Supreme Court intended, because Daimler and the amendment to Rule 45 came out almost simultaneously, within a year of each other. Lawyers, the government, litigants every day issue subpoenas in federal cases, nationwide basis. I serve dozens of them a month. If I want to subpoena somebody in California for a case that's pending in New York, I serve the subpoena. The analysis is not whether the court in New York has personal jurisdiction over the non-party subpoena recipient in California. That's just not what Rule 45 requires. The subpoena is served in California. I suppose the vent is that, the release valve that's designed into Rule 45, is that if the subpoena recipient in California finds it burdensome to come to New York to challenge the subpoena, they have a way to challenge it in California. That's what was designed into Rule 45. But to say that a Rule 45 subpoena requires independent basis of jurisdiction over the non-party subpoena recipient, eviscerates Rule 45. My yellow light is on. Does that mean I have to stop, or does that mean I have a... You have a little bit of time, not much. Okay. But if you want to have time for rebuttal, you should sit down. Okay. One other thing must be mentioned, just because I think it's outrageous, is the court below, part of the analysis is the interest of the United States in having its judgments enforced. And the court below said, look, only one plaintiff was an American citizen, the rest weren't. So they discounted the suffering of my clients based on who's a citizen, despite the fact that the law, as written and as this court ruled in the previous appeal in the Leibovitch case, gives non-citizen family members of citizens the same rights to make a claim. And people are no less people because, you know, my wife is a citizen and I'm not. And to take that into account and say, well, that discounts the interests of the United States in having its terrorism judgments enforced, it was really just an outrageous comment by the court below. I see the red light is on. Okay. Well, thank you, Mr. Tulsa. Ms. Turiello? Oh, I'm sorry. I'm sorry. I was looking at the wrong card. Mr. Boccuzzi? Yes. Yeah. Okay. I'll take it. Thank you. Good morning. May it please the court. My name is Carmine Boccuzzi. I represent BNP Paribas, and I will be presenting the argument on behalf of both appellees today, BNP Paribas and Bank of Tokyo Mitsubishi. The district court was correct in finding that there was no jurisdiction to require the banks here to conduct the extraordinary worldwide search for assets and worldwide restraints that the plaintiffs demanded. Plaintiffs have dropped their argument that they made below that general jurisdiction exists to do this, and that, of course, is correct given the ruling in Daimler. And so they trained their arguments on specific jurisdiction. The district court was correct in finding that no specific jurisdiction exists to enforce these subpoenas and the citation and the restraint as plaintiffs would have the court do. The analysis laid out by the court followed the proper steps. He looked to the contacts between the banks and the forum, and he considered both Illinois as the forum and the United States and found in both cases. So the argument about whether we look to Illinois and the United States is a bit academic here, given that in either analysis the plaintiffs fall short of satisfying the minimum contacts requirement. Then you need to say do the contacts arise from or relate to what plaintiff is seeking. Well, what would you suggest they do? If you're right that they're not entitled to relief, what should they have done? What they should do is they could get the information from the local branches, and that's a start, and they can see what's in the United States. And then they have their judgment. They should have their judgment recognized in other jurisdictions, or they can proceed through letters of regulatory and the Hague Convention as to my client and try to learn about accounts that are located in Europe. That's the $62 million? That's the judgment? The $62 million, yes. Because at the end of the day, these plaintiffs cannot one-shot stop in this enforcement proceeding. Under the FSAA, they are limited to assets of Iran in the United States. So even if they found out about an Iranian asset in some other jurisdiction that they could get, they would have to go to that jurisdiction in any event to seize the asset. So they're actually creating a burden from themselves by trying to start in the United States, find out about assets somewhere else where there's no jurisdiction to do that, and then go there to actually get the asset because they're not able to do that in the United States. And that's a factor that's relevant to the fair play and substantial justice as well as the comedy. If we think about administrative efficiency for the court and for the parties, frankly, having this sort of opening act in the United States when, at the end of the day, they need to go elsewhere is a huge point that supports what the district court did below. And then looking at the analysis and specific jurisdiction, just to finish that out, there are obviously no Illinois contacts between these banks and Iranian assets. And the only thing plaintiff has pointed to when it falls back to the U.S. contacts, and just one point about that, we do not concede that the U.S. contact analysis is the right analysis. They, first of all, proceeded by way of the Illinois citation process. That's a state court procedure. That's the procedure they're going through to actually get the assets. The Rule 45 subpoena is kind of a tag-along. It's an ancillary document that just repeats exactly what's in the Illinois papers that they served on our Chicago branches. But putting that aside, Rule 45 does not create jurisdiction. And so the question is, yes, they may have served it, which they served out of the District Court of Illinois, but there's no basis for them saying they could look to United States contacts in analyzing the specific jurisdiction question. But be that as it may, if you looked at the New York conduct, so the fact that certain EFTs went through the New York branches in the context of that conduct, that the banks have entered into civil settlements as to and pled guilty to in the case of my client, that conduct is a definition of fortuitous in terms of what they're going after. In terms of Bank of Tokyo, that conduct ended in 2007, more than eight years before he served his citation. In terms of my client, it ended tail end in 2012, so three years before he served his citation. So it's completely unrelated. This court's decision in GCIU says you look to the temporality of the supposed contacts to determine whether you meet that necessary minimum. And one point, Your Honor, Judge Manning, you asked about the money that recently went to Iran. My client paid civil fines to the government in connection with this conduct. That's the tune of approximately $8 billion. The U.S. government has announced that that is now – Eight billion, did you say? Eight billion, yes. That is now in a fund in Washington that the government has announced is available for the victims of terrorism. So going back – You mean they can get at that money here? I'm not – they're issuing regulations, but the money is here, and it is here for terror victims. And so the question is who has a claim to it. I'm not sure if that's been worked out, but I would assume his clients would meet some of the requirements or at least a U.S. citizen among his eight plaintiffs. So in terms of his plaintiffs and the claims, they were non-citizens except for one, Shara. All the claims that underlie this default judgment were, in fact, under Israeli law except for the one U.S. citizen who had an FSAA terror claim. So she potentially has a claim to some of those funds that have been set aside. So in the context of collecting against a foreign state, as we've been discussing, they will have to go to another forum. Otherwise, usually the way to recover is on an intergovernmental settlement basis or the kind of fund that's been set up in Washington for these purposes. So getting back to specific jurisdiction. But the non-citizens couldn't get anything from this $8 billion in Washington? I'm assuming no, but I'm not sure if that's been decided or the regs have been issued, so I can't answer that definitively, Your Honor. And then the final piece, which is whether the assertion of the jurisdiction over these banks would comport with fair, plain, substantial justice. The district court was clearly right and didn't abuse its discretion in weighing the factors relevant to that analysis. He took into account the burden that these banks face in terms of potential civil and criminal liability in Japan for the Bank of Tokyo and in Europe and France for my client under the bank secrecy laws. He considered the diminished interest of this forum. It was no slight to plaintiffs, but it was relevant to the analysis that none of these plaintiffs live in Illinois. And I don't know if any of them even live in the United States. And so, again, we have this idea of this almost an ancillary action being brought to Chicago for whatever reason, and the district court wondered why we were here to begin with, seeking this extraordinary worldwide discovery. And you take that with the efficient administration of justice, what we've been discussing before, that no matter what, they're going to have to go to multiple forums to collect on their judgment. And the fact that what he's demanding would require the collection of documents, the production of witnesses from everywhere, but not here. What was the $62 million judgment that Mr. Tolson referred to? It was a family driving in Israel, and they were attacked by, I think, a PLO organization that had ties to Iran. And there was a child who was killed tragically and another child who was wounded, and I think other people were wounded as well, or at least had the suffering that goes along with losing a family member. Where did they get this judgment? It was a default judgment issued, I believe, in this district. In this district? I think it was in the northern district of Illinois. I believe so. Who was the defendant? The Islamic Republic of Iran. Pardon? The Islamic Republic of Iran. Oh, I see. So, it was purely against the state actors. And I think maybe Syria might have been a defendant and the Iranian Ministry of Information. The theory being the Iranian Ministry of Information encourages and goads on such terrorist activity by these types of organizations in Israel. But it's a default judgment. They didn't appear or anything else, right? Correct. They didn't appear. But I assume that in keeping with the requirements of the Foreign Sovereign Immunities Act, the district court had to have a form of an inquest to make findings and then issue the default judgment from there. Of course, my client and Mr. Villapiano's clients, the banks, were not involved in any of that, were strangers to this litigation, and so were only brought in upon the service of the subpoenas. And it's very telling. I mean, Mr. Tolchin said repeatedly he doesn't know where anything is. So, again, we're dealing with speculation. And just briefly, if Your Honors don't have any further questions about jurisdiction, there is an alternative basis for upholding, if there was any doubt about the jurisdictional analysis, which I think is sound, we have the comedy analysis that the court did where, in his discretion, he gave comedy and said that the plaintiffs should go through the Hague Convention for my clients or go and avail themselves of the procedures in Tokyo and Japan for having their judgment recognized and enforced there. Was the $62 million judgment paid? No, as far as I understand, the Iranians... Is that because there are no Iranian assets in Illinois? I would assume they're not. I would assume that if there are any Iranian assets... I see. Because we had a case many years ago where there were Iranian assets in Chicago and they were collected by someone. Oh, right, yes. I remember some of those FSA cases. There were some artworks that people litigated over. Exactly, exactly. But my understanding is that the judgment still remains unsatisfied, and so the plaintiffs have turned to the banks. But in terms of the comedy analysis, this Court's decision in the United States v. First Bank of Chicago makes it clear that if the district court did not do a comedy analysis, given the potential criminal and civil liability facing our clients, that would have been reversible error. So he did what is the rule in the Seventh Circuit when you face that potential for liability. He weighed the relevant comedy factors, and he found that they weighed in favor of the Hague Convention or going to Japan. There's no argument that he applied the wrong standard, and to the extent there's an attempt to say, well, he weighed it wrong, there's no argument that's correct that would say that the weighing he did fell outside the bounds of reason that we associate with the abuse of discretion standard. Yes, he recognized in terms of looking at the first factor that these documents are of potential importance to plaintiffs. But, of course, that's based on the speculation that there is information that's going to lead him to enforceable assets. But the Court gave him that. But then in looking at the other factors relevant, he noted that these demands are very broad in scope and that they would require my client to look across 75 jurisdictions where they have branches, require the Bank of Tokyo Mitsubishi to look across 40 jurisdictions where they have branches. So incredibly broad and burdensome. We're talking by definition about foreign source documents given the lack of assets that appear to be in the United States. You have the alternative means at hand, the Hague Convention, which the United States signed the Hague Convention. It is part of the law of this land, as did France. So I don't think it's correct for the plaintiff to just dismiss that as some alien thing being pressed upon him. And then he's got the Tokyo Judgment Enforcement Proceedings that he could avail himself in Japan. Is the notion that any Iranian assets in the various branches of the Bank of Tokyo, your clients, would be identified as Iranian assets? I mean, that's another layer to this. I mean, wouldn't Iran, if it's putting money in foreign banks, not want it identified as Iranian? Which would be very easy to do, I'm sure. Well, there is a Second Circuit case involving Iran and Bank Markazi where certain interests and bonds were put in the name of an Italian bank, UBAE, and that was ultimately discovered through legislation by Congress, I believe, or something. I'm not sure of the facts. But yes, that's another layer to this, which you could imagine will lead plaintiff to even broaden his discovery demands vis-à-vis the banks. But again, it's very much speculation on his part. And then finally, you have the banks subject to these laws and you have, unchallenged below, the fact that in the United States, in Illinois, there's no centralized database. This information is not accessible in the United States. There's no press a button and see where everything is in the bank. That's just not how it works, and that makes sense. There's no need for the bank to do that, and of course bringing that information into the United States would itself be a violation of the data privacy laws and the bank secrecy laws. So the court weighed the comedy factors, balanced them out, did what he was supposed to do. It's a very thorough decision, and so the comedy analysis stands as another reason why the district court should be affirmed in all respects. I don't know if Your Honors have any additional questions about this. Probably not. Thank you very much. Okay, well, thank you, Mr. Bacusi. And Mr. Tulce, your time ran out, but if you'd like another minute or two, you can have it. Sorry, I thought I had reserved some time for rebuttal, but just to answer a couple of quick questions. The Rule 45 subpoena is not a tag-along irrelevancy. It is a separate track. We served a citation. We served a Rule 45 subpoena. One might be enforceable, one might not, but Mr. Bacusi told the court that this is a citation proceeding with a tag-along subpoena. No, it's not true. It's both. The fund, Judge Posner, I heard your questions about the $8 billion fine. I can tell you exactly what happened to that. That went into the United States Treasury. In December of 2015, Congress passed a law, little noticed, except among people who handle foreign sovereign immunity terrorism claims. A fund was created called the United States Victims of State Sponsored Terrorism Fund. $1 billion was allocated to that fund. To be precise, it was $1,050,000,000, not the whole $8 billion. A mechanism was set up with a special master. Kenneth Feinberg was appointed as a special master to collect claims, analyze them, see what's enforceable, what's not, what meets the requirements, what doesn't, and then to distribute that $1 billion to the claimants. Something in the order of 2,000 claims were submitted. The aggregate of the claims is $11 billion and change, and there are certain limits and caps and setoffs. For example, people who collected money by enforcing their judgment someplace against an asset, they can't double dip. It's a setoff. Did it include 9-11 victims? It does not include 9-11. This fund is not 9-11. Mr. Feinberg was the administrator of the 9-11 fund also. This does not include 9-11, but it includes people who have judgments against a state sponsor of terrorism under the FSIA, and it also includes people who were held hostage in Iran during the Carter administration. Those people never got any kind of compensation. So right now, literally last week, the fund announced the allocations of money. People who submitted qualifying judgments will receive 13.6% of their compensatory awards. The fund has a lifespan of 10 years but has now spent all the money that's been allocated to it. It's a big question mark whether any additional money will be allocated. Obviously, a lot of people believe that if $1 billion from the fine paid by the defendants or the subpoena recipients here was allocated to the fund, then some more of that money should also be allocated to the fund. Does your client have a claim in that? My clients have a claim in that, yes. But like I said, it only gets them so far 13.6% of their judgment, the vast majority of their judgment remaining unpaid. You mean 13.6% of $62 million? Yes. Well, I have to qualify that too. One of the caps is that in distributing the money, no family can receive more than $30 million and no individual can receive more than $20 million. So with the distribution that's going on right now, nobody's coming close to that cap. But let's say the whole $8 billion was put into the fund, then that cap would come into play. Okay. Well, thank you, Mr. Tolchin. Thank you. Move on. So we're going to hear the first case.